*In the Matter of the Petition of Everest Investment*
  *Advisors, Inc., et al.*
Case No. 1474 September Term, 2017
Opinion by Meredith, J.


**ADMINISTRATIVE AGENCIES – REGULATORY SANCTIONS – MARYLAND SECURITIES ACT.** The Maryland Securities Act empowers the Maryland Securities Commissioner to impose sanctions against registered investment advisors for violations of the Act, including fines of up to $5,000 per violation and a permanent bar from engaging in the investment advisor business in Maryland. Upon judicial review, the court considers whether the sanction imposed by the Commissioner was arbitrary or capricious, and will defer to the Commissioner unless the sanction was imposed unreasonably or without a rational basis.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1474

September Term, 2017

IN THE MATTER OF THE PETITION OF
EVEREST INVESTMENT ADVISORS, INC.,
ET AL.

Meredith,
Berger,
Zarnoch, Robert A.
    (Senior Judge, Specially Assigned),

JJ.*

Opinion by Meredith, J.

Filed: October 31, 2019

* Chief Judge Matthew Fader did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

 Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

After the Maryland Securities Commissioner (the "Commissioner"), appellee, imposed sanctions against Philip Rousseaux, appellant, and two companies he owned—Everest Investment Advisors, Inc. ("EIA"), and Everest Wealth Management, Inc. ("EWM")—Mr. Rousseaux and his two companies filed a petition for judicial review in the Circuit Court for Baltimore City. In that court, Mr. Rousseaux and his companies did not contest any of the Commissioner's findings that they had committed over a thousand violations of Maryland securities law, but they argued that the disciplinary sanctions imposed by the Commissioner were arbitrary and capricious because of their severity despite being authorized by Maryland Code (1975, 2014 Repl. Vol.), Corporations and Associations Article ("CA"), §11-701.1[1]

---

[1] The version of CA § 11-701.1(b) in effect at the time of the charges against Mr. Rousseaux and his companies provided that the Commissioner is authorized to impose the following disciplinary orders after finding violations of the Maryland Securities Act:

> (b) Whenever the Commissioner determines after notice and a hearing (unless the right to notice and a hearing is waived) that a person has engaged in any act or practice constituting a violation of any provision of this title or any rule or order under this title, the Commissioner may in his discretion and in addition to taking any other action authorized under this title:
>
> (1) Issue a final cease and desist order against such person;
>
> (2) Censure such person if such person is registered under this title;
> (3) Bar such person from engaging in the securities business or investment advisory business in this State;
>
> (4) Issue a penalty order against such person imposing a civil penalty up to the maximum amount of $5,000 for any single violation of this title; or

continued…

The circuit court upheld the Commissioner's disciplinary rulings, and Mr. Rousseaux alone filed a notice of appeal.

## QUESTION PRESENTED

Mr. Rousseaux's brief states that the single issue presented in this appeal is the question posed at the end of this paragraph:

> The sanctions ordered against Mr. Rousseaux—revocation of his investment adviser representative registration, permanent bar from the Maryland securities and investment advisory industry, and a $255,000 fine—are unprecedented and disproportionately harsh given the misconduct at issue. Accordingly, Mr. Rousseaux lacked notice that his compliance errors could result in the severe sanctions imposed. Does the unprecedented and disproportionately harsh nature of the sanctions and resulting lack of notice, and thus lack of due process, render the sanctions imposed against Mr. Rousseaux arbitrary and capricious?

The answer to the question is that there was no lack of notice, no lack of due process, and no imposition of arbitrary or capricious sanctions. Accordingly, we shall affirm the judgment of the Circuit Court for Baltimore City.

## FACTS AND PROCEDURAL BACKGROUND

The "Maryland Securities Act" ("the Act") is Title 11 of the Corporations and Associations Article. *See* CA § 11-805. It provides the statutory framework for the regulation of the securities and investment advisory businesses in Maryland. Section 11-201 establishes, within the Office of the Attorney General of Maryland, a Division of

_____

continued…

> (5) Take any combination of the actions specified in this subsection.

2

Securities (the "Division"), which administers the Maryland Securities Act. The Division is headed by the Securities Commissioner.

CA § 11-701 vests enforcement authority, including subpoena power, in the Commissioner. As noted above, CA § 11-701.1(b) authorizes the Commissioner to order a broad range of disciplinary actions after determining that "a violation" of the Maryland Securities Act has occurred, including barring the violator from engaging in the securities business or investment advisory business in this State.

On June 17, 2015, the Division served an order to show cause upon counsel for Mr. Rousseaux and his companies (EIA and EWM), alleging a long list of securities act violations dating back to 2004, and ordering that

> Respondents EIA and Rousseaux each show cause why each Respondent's registration as an investment adviser or investment adviser representative, respectively, should not be revoked; why Respondents EIA, EWM, and Rousseaux should not be barred permanently from engaging in the securities and investment advisory business in Maryland; and why a statutory penalty of up to $5,000 per violation should not be entered against each Respondent[.]

The show cause order alleged a large number of violations of the Act by Mr. Rousseaux and his companies. Because Mr. Rousseaux does not dispute in this appeal any of the factual or legal findings made by the Commissioner other than the sanctions, we will quote extensively from findings made by the Commissioner. [2]

---

[2] On November 1, 2016, the Maryland Securities Commissioner "delegate[d]" to a Special Assistant Attorney General who had formerly served as Deputy Securities Commissioner: "the powers and authority of the Securities Commissioner under the Maryland Securities Act . . . to rule on exceptions, preside over any oral argument, make any other necessary rulings and render a final decision in this matter [*i.e.*, File No. 2014-

continued…

**Violations**

The main areas of focus were the following.

*Misrepresentations related to unauthorized use of MetLife Medallion Signature Guarantee stamps*

In order to appreciate the significance of Rousseaux's misconduct with respect to his use of misappropriated pre-stamped MetLife Medallion Signature Guarantee forms, it is necessary to understand how the Medallion stamps are normally utilized in connection with transferring securities. The following description is provided on the website of the United States Securities and Exchange Commission ("SEC") at https://www.sec.gov/fast-answers/answers-sigguarhtm.html (last visited 10/29/2019):

> ## Signature Guarantees: Preventing the Unauthorized Transfer of Securities
>
> If you hold securities in physical certificate form and want to transfer or sell them, you will need to sign the certificates or securities powers. You will probably need to get your signature "guaranteed" before a transfer agent will accept the transaction. Although it's an inconvenience to get your signature guaranteed, the process protects you by making it harder for people to take your money by forging your signature on your securities certificates or related documents. Transfer agents insist on signature guarantees because they limit their liability and losses if a signature turns out to be forged. One way to avoid having to get your signature guaranteed is to have your securities held in street name, meaning that your securities are held in the name of your brokerage firm instead of your name.
>
> An investor can obtain a signature guarantee from a financial institution – such as a commercial bank, savings bank, credit union, or broker dealer –

_____

continued…
0119, pertaining to Philip Rousseaux, Everest Investment Advisors, Inc., and Everest Wealth Management, Inc.]." For purposes of this appeal, we will refer to this delegate as "the Commissioner."

4

that participates in one of the Medallion signature guarantee programs. The three Medallion signature guarantee programs are the:

›       Securities Transfer Agents Medallion Program (STAMP) whose participants include more than 7,000 U.S. and Canadian financial institutions.

›       Stock Exchanges Medallion Program (SEMP) whose participants include the regional stock exchange member firms, and clearing and trust companies.

›       New York Stock Exchange Medallion Signature Program (MSP) whose participants include NYSE member firms.

**If a financial institution is not a member of a recognized Medallion Signature Guarantee Program, it would not be able to provide signature guarantees. Also, if you are not a customer of a participating financial institution, it is likely the financial institution will not guarantee your signature. Therefore, the best source of a Medallion Guarantee would be a bank, savings and loan association, brokerage firm, or credit union with which you do business**.

A Medallion imprint or stamp indicates that the financial institution is a member of a Medallion signature guarantee program and is an acceptable signature guarantor. By participating in the program, financial institutions can guarantee customer signatures with the assurance that their guarantees will be immediately accepted for processing by transfer agents.

**Transfer agents can refuse to accept a signature guarantee from an institution that does not participate in the Medallion program or that is not recognized by the transfer agent.** While guarantor firms can charge a fee for their services, they often don't and offer them as part of their customer services.

If you have general questions about Medallion signature guarantees or how the Medallion program works, you can send an email to Kemark Financial Services, Inc., the program administrator for STAMP and SEMP, at contactkfs@kemark.com. The SEC provides Kemark's email address for information purposes only. We cannot endorse any commercial entity, and we do not endorse or recommend any of its products or services. For specific questions about a security, the Shareholder Services Department of the company whose shares you own or its respective transfer agent may be best suited to assist you.

(Emphasis added.)

The website for Kemark Financial Services, Inc., the program administrator of the Securities Transfer Agents Medallion Program (STAMP), provides this additional information about the use of Medallion signature guarantees at http://kemarkfinancial.com/programs.html (last visited 10/29/2019):

> For over one hundred years, Issuers of Securities and Transfer Agents have relied upon the signature guarantee process for the transfer of securities. This process, codified in the Uniform Commercial Code (UCC), makes the Transfer Agent liable for improper securities registration. **To register or re-register a security, the Transfer Agent or Issuer relies upon the warranties made by a Medallion Guarantor when placing a Medallion Guarantee Stamp on a security, namely, that the signature is genuine, the signer is an appropriate person to endorse, and the signer had the legal capacity to sign.**

(Emphasis added.)

A financial institution that provides a Medallion signature guarantee pursuant to the STAMP program agrees to indemnify and hold harmless issuers of securities and transfer agents against all claims and losses arising out of the transfer, exchange, or delivery of securities in reliance upon the Medallion guarantee. *See* http://kemarkfinancial.com/assets/stampindemnityagreement.pdf (last visited 10/29/2019).

Rousseaux worked for MetLife Securities, Inc. and Metropolitan Life Insurance Company, Inc., from January 2003 to October 2004. When Rousseaux ended his affiliation with MetLife, he took with him a large quantity of forms intended to authorize the transfer of a customer's assets. These forms had been pre-stamped with MetLife's

Medallion Signature Guarantee stamp in blank. In other words, these fill-in-the-blank forms to facilitate the transfer of financial assets bore a MetLife Medallion stamp purporting to guarantee the signature of the transferring party even though the forms had not been signed by anyone. The presence of the MetLife Medallion stamp on the forms represented that MetLife had verified the identity of the signor and would indemnify a transferee who detrimentally relied upon the signature.

After Rousseaux left MetLife, while affiliated with USAllianz Securities, Inc., he used at least 58 client authorization pages of asset transfer forms that had been pre-stamped with the MetLife Medallion Signature Guarantee stamp to facilitate the transfer of financial assets. Rousseaux also used at least 33 of the pre-stamped forms containing a MetLife Signature Guarantee Medallion stamp in connection with the transfer of client assets to Conseco.

The Commissioner found that "Respondent Rousseaux violated sections 11-301(2) and (3) of the Act by obtaining and using, without authorization, blank ATA [Asset Transfer Authorization] forms pre-stamped with the MetLife Medallion Signature Guarantee Stamp, signed by him or by persons whose identity is unknown, in connection with the sale of clients' securities to invest in non-MetLife insurance products, which thereby misrepresented that MetLife had verified the clients' identities."

Section 11-301(2) and (3) of the Act provide:

It is unlawful for any person, in connection with the offer, sale, or purchase of any security directly or indirectly to:

* * *

7

(2) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(3) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on any person.

As noted above, Mr. Rousseaux has not challenged on appeal the Commissioner's finding that he committed 91 violations of CA § 11-301(2) and (3) relative to his unauthorized use of the pre-stamped MetLife Medallion Signature Guarantee forms.

*Misrepresentations regarding EIA's "Wrap Fee Program"*

In 2013, EIA began promoting a new investment program for its clients. Rousseaux and EIA wanted to describe the program as a "wrap fee program." The SEC requires specific disclosures for a "wrap fee program," which is a relationship in which "an investment advisory client pays a flat fee for investment advisory services, and is not charged separate brokerage commissions or transaction charges." EIA and Rousseaux filed brochures with the Division that stated that EIA was offering a wrap fee program, pursuant to which "clients pay a single annualized fee of 200 basis points (2.00%) on the assets being managed under the Program, which covers both investment management fees and securities transaction charges." But, despite promoting the program as a wrap fee program that provided EIA's "clients with the ability to trade in certain investment products without incurring separate brokerage commissions or transactions charges," EIA's participating investors were still charged transaction fees on transactions conducted in their Charles Schwab accounts. At least 85 clients invested in the program that was improperly promoted as a wrap fee program.

8

The Commissioner found that Rousseaux's "knowing or reckless disregard of the discrepancy between the wrap fee disclosure language and the actual operation of the [program at EIA] caused investors in the [program] to be misled[,] and led to false and misleading filings with the Commissioner." The misleading statements violated CA § 11-303, which states:

> It is unlawful for any person to make or cause to be made, in any document filed with the Commissioner or in any proceeding under this title, any statement which is, at the time and in the light of the circumstances under which it is made, false or misleading in any material respect.

*Misrepresentations regarding past performance results*

A proprietary investment program that EIA began promoting in 2013 was called the Everest Dynamic Growth Model Portfolio (also sometimes referred to by the acronym "EDGM"). Promotional material EIA provided to prospective investors included representations that the "5 and 10 years long term performance/growth of the [EDGM] as of 1/1/2014" would have been 8.92% and 8.64%, respectively. But the performance figures were not based upon analyses of actual performance. The Commissioner found: "These performance figures were false." Rousseaux subsequently sent a letter to clients admitting that the performance data "was incorrect." And, although at least two clients were told that the model portfolio would have outperformed the Standard & Poor's 500 Index by 37%, EIA was unable to provide the Division documentation to support that claim.

9

*Misrepresentations as to minimum account balance for the EDGM program*

For marketing purposes, Rousseaux wanted to pitch the EDGM program as an exclusive investment opportunity, and, to that end, EIA stated in a brochure for prospective clients that there was a minimum investment requirement of $100,000 to participate in the EDGM program. But, despite the representations regarding a "minimum investment," EIA waived the minimum so frequently that "[a]pproximately half of the clients who entered the EDGM program invested less than $100,000." According to some EIA employees, the account minimum was actually just $10,000.

*Misrepresentation of the amount of assets under management by EIA*

One of the criteria for being listed in trade magazines such as Barron's and Worth is the amount of a financial advisor's "Assets Under Management" or "AUM." In an effort to appear to have a greater amount of Assets Under Management than Rousseaux's companies actually had, Rousseaux intentionally counted among his companies' Assets Under Management certain assets of clients that were, in reality, being managed by others.

*Use of a fictitious "Investment Committee" for marketing purposes*

Another of Rousseaux's marketing ploys was to tell prospective clients that they would not be accepted as an Everest client unless they were approved by the "Investment Committee." It appears that there was actually no such committee weeding out potential clients. The Commissioner found that, in a 2013 talk Rousseaux gave to a "group of successful insurance professionals," Rousseaux described the Investment Committee as

10

"a marketing strategy [that] took away the decision-making power from prospects by engaging in 'psychological warfare' and 'freaking mind games.'"

The Commissioner found: "The Investment Committee had no set membership and the decision to take on a client could be made by an individual employee. There were no committee minutes that would establish that the Investment Committee conducted any activities, and no evidence was presented of a charter or other organizing document for the Investment Committee." "These circumstances fully support the conclusion that the Investment Committee was indeed a 'ploy' or marketing device that the Respondents used to induce prospective clients to invest money with EWM . . . ." The Commissioner concluded that the misrepresentations about the Investment Committee violated CA § 11-302(a)(2) and (c). The Commissioner found:

> [A]ll Respondents violated section 11-302(a)(2) of the Act by engaging in acts, practices, or courses of business which operate or would operate as a fraud or deceit on another person, . . . and also violated section 11-302(c) of the Act in the solicitation of or in dealings with advisory clients, by knowingly making untrue statements of material fact or omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.[3]

---

[3] The sections of the Act referenced by the Commissioner—*i.e.*, CA § 11-302(a)(2) and (c)—state:

(a)      It is unlawful for any person who receives, directly or indirectly, any consideration from another person for advising the other person as to the value of securities or their purchase or sale, or for acting as an investment adviser or representative under § 11-101(i) and (j) of this title, whether through the issuance of analyses, reports, or otherwise, to:

* * *

continued…

11

*Misuse of a "Financial Planning Agreement" form*

Yet another marketing tool Mr. Rousseaux and his companies used was found to violate the Act. In 2012, both EIA and EWM began requiring new clients to sign a "Financial Planning Agreement" that included a penalty provision stating: "[I]f the accounts we signed up for today are not opened and funded within 60 days, we are to pay a fee of $500 per account." But, soon after EIA began utilizing the agreements, EIA filed a registration application with the Division stating that it did not offer or provide financial planning services or charge a fee for such services. And, in a brochure sent to its clients, EIA failed to disclose that it charged a $500 fee if an account was not funded within 60 days. The Commissioner found that the use of these agreements was a violation of CA § 11-302(a)(2) and (3) and § 11-302(c), and that Mr. Rousseaux and his companies had required at least 165 clients to sign forms containing the threatened $500 penalty.

*Use of unregistered Investment Advisor Representatives*

Another marketing tactic that violated the Act involved compensating clients for soliciting other potential clients. As compensation for referring a new client to Everest,

_____

continued…
> (2) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on the other person;
>
> * * *
>
> (c) In the solicitation of or in dealings with advisory clients, it is unlawful for any person willfully to make any untrue statement of a material fact, or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading.

the referring clients received a variety of rewards, including trips, dinners, and other benefits. Under this "VIP Program," 72 clients solicited new clients for the companies. The Commissioner found that the soliciting clients met the definition of "investment adviser representative" pursuant to CA § 11-101(i), and that Mr. Rousseaux and his companies failed to register the soliciting clients as investment adviser representatives, in violation of CA § 11-402(b), which, at the pertinent time, stated:

> (b)(1) An investment adviser required to be registered may not employ or associate with an investment adviser representative unless the representative is registered under this subtitle.
>
> * * *
>
> (4) When an investment adviser representative begins or terminates a connection with a registered investment adviser or terminates those activities that make the representative an investment adviser representative, the investment adviser shall promptly notify the Commissioner.

*EWM held itself out as an Investment Advisor despite not being registered with the Division as required*

The Commissioner found that there appeared to be a lack of separation between EWM and EIA, and that, in 2012, EWM was holding itself out as a "small boutique local investment advisory firm" in print advertising and on the radio, despite the fact that EWM was not registered with the Division as an investment advisor. Even after the Division notified Mr. Rousseaux and EWM of the apparent violation, EWM continued for a period of time to hold itself out as an investment advisor in violation of CA § 11-401(b).

13

## Number of violations

In the Commissioner's final order, the Commissioner summarized as follows the number of violations being taken into consideration in determining the appropriate sanctions:

I have considered the following violations found in the Proposed Ruling and the Proposed Decision:

(A)   Respondent Rousseaux obtained and used, without authorization, blank Authorization to Transfer Assets forms pre-stamped with the MetLife Medallion Signature Guarantee Stamp, signed by him or by persons whose identity is unknown, in connection with the sale of clients' securities to invest in non-MetLife insurance products, thereby representing that MetLife had verified the clients' identities.  This occurred in **58** instances in connection with investments in Allianz annuities and in **33** instances in connection with investments in Conseco annuities after Rousseaux had left MetLife.  Proposed Ruling, Findings of Fact 25, 30.

(B)   Respondents EIA and Rousseaux misrepresented the nature of the EDGM program as a wrap fee program to EDGM's **85** investors.  Proposed Ruling, Findings of Fact 40, 43.

(C)   Respondents EIA and Rousseaux issued false and misleading performance figures in the IPS for the EDGM program to EDGM's **85** investors.  Proposed Ruling, Findings of Fact 43, 44, 45.

(D)   EDGM's performance was misrepresented by an agent of EIA to **2** prospective investors.  Proposed Ruling, Finding of Fact 46.

(E)  Respondents EIA and Rousseaux failed to disclose to EIA's clients that EIA offered financial planning services and that it charged a $500 fee per account not funded, in EIA's Form ADV Part 2A brochure delivered by email to **173** EIA clients in February 2013 and to **234** EIA clients in February 2014.  Proposed Decision, pages 10-11, Findings of Fact 3, 4; Proposed Ruling, Finding of Fact 57.

(F)   Respondents EWM and Rousseaux required at least **67** clients and Respondents EIA and Rousseaux required at least **98** clients to sign a Financial Planning Agreement with EWM or EIA, respectively, containing a contingent $500 fee, the sole purpose of which was to penalize clients

14

who chose not to fund their accounts with EWM or EIA within 60 days, or who chose not to continue their advisory relationship with EWM or EIA. Proposed Ruling, Findings of Fact 50, 56.

(G) All Respondents used an "Investment Committee" and an "exclusive club" as ploys to manipulate advisory clients or to convince them to open advisory accounts. There is evidence regarding communications to **2** clients or prospective clients in which the Investment Committee was specifically mentioned. Proposed Decision, page 8, Findings of Fact 3, 4.

(H) Respondents EIA and Rousseaux caused the amendment of EIA's Form ADV Part 2A brochure to inflate the stated minimum investment amount needed to open an account, and caused this amended brochure to be sent to **234** email accounts in February 2014. Proposed Ruling, Findings of Fact 74, 75. Approximately half of the clients who entered the EDGM Program invested less than the $100,000 stated minimum. Proposed Decision at p. 15, Findings of Fact 1, 2, 3.

(I) Respondent EWM failed to include required provisions in the Financial Planning Agreement in **67** instances and Respondent EIA failed to include required provisions in the Financial Planning Agreement in **98** instances. Proposed Ruling, Findings of Fact 50, 58.

(J) Respondents EIA and Rousseaux filed with the Division in March 2014, a Part 2A Disclosure Brochure and a Wrap Fee Program Brochure, **both** of which falsely represented to the Division that EIA was offering a wrap fee program under which clients would pay a single fee that covered both investment management fees and securities transaction charges. Proposed Decision, Facts Relevant to Sanctions, The Wrap Fee Brochure, Finding of Fact IA, at paragraph 31 herein.

(K) Respondent EIA filed with the Division on **4** separate occasions EIA's Form ADV that falsely represented to the Division the amount of EIA's regulatory assets under management. Show Cause Order, paragraph 64; Answers, paragraph 64; Proposed Ruling, Finding of Fact 68.

(L) Respondents EWM and Rousseaux held EWM out as an investment adviser by requiring **67** of EWM's clients to sign a Financial Planning Agreement. Proposed Ruling, Findings of Fact 50, 84.

(M) Respondents Rousseaux and EIA implemented the VIP Program, offering benefits accepted by **72** clients for soliciting clients for

15

Respondents. These soliciting clients were not registered as investment adviser representatives. Proposed Ruling, Findings of Fact 85, 88, 89.

(N)  Respondents EIA and Rousseaux failed to file new and updated or different versions of contracts previously filed with the Division in **3** specified instances. Proposed Ruling, Finding of Fact 85; Proposed Decision, page 11, Findings of Fact 1, 2, 3.

(O)  Respondents EIA and Rousseaux failed to maintain and/or produce required books and records in **3** specified instances. Proposed Ruling, Findings of Fact 92, 93, 94.

(P)  Respondent Rousseaux failed to amend his Form U4 as required in **1** specified instance. Proposed Ruling, Finding of Fact 104.

(Q)  Respondents EIA and Rousseaux failed to amend EIA's Form ADV in **1** specified instance. Proposed Ruling, Finding of Fact 106.

(R)  Respondent EIA failed to enforce its Written Supervisory Guidelines in **7** specified areas. Proposed Ruling, Findings of Fact 95, 96, 97, 98, 99, 100, 101, 102.

The Commissioner's Final Order noted that the above list of violations "provide[s] only a partial picture of the potential number" of violations of the Maryland Securities Act committed by Mr. Rousseaux and his companies because the tallies

> do not capture violations for which specific incidents are not enumerated. Among other examples, the evidence does not allow a determination of how many prospective EDGM investors, who ultimately did not invest in EDGM, received false and misleading performance information for EDGM and/or received false representations that EDGM was a wrap fee program in which an investor would pay a single annualized fee of 2% on the assets under management that covered both investment management fees and securities transaction charges when, in fact, the investors were charged transaction fees. Similarly, the evidence does not allow the identification of every prospective client of EIA and/or EWM who was told that the Investment Committee would decide whether that person would be accepted as a client.

With that qualification, the Commissioner summarized the number of violations attributable to the respondents in ¶ 61 of the Final Order:

61.  Taking into account only the violations described in paragraph 58 of this Final Order, the following summarizes the violations for each Respondent:

- Rousseaux's violations total **1,218,** of which **92** are individual violations, **990** are violations in which EIA was also a participant, **134** are violations in which EWM was also a participant, and **2** are violations in which all three Respondents were participants.

- EIA's violations total **1,103**, of which **111** are best characterized as individual violations, **990** are violations in which Rousseaux was also a participant, and **2** are violations in which all three Respondents were participants.

- EWM's violations total **203**, of which **67** are best characterized as individual violations, **134** are violations in which Rousseaux was also a participant, and **2** are violations in which all three Respondents were participants.

(Emphasis in original.) In other words, the Commissioner found that Mr. Rousseaux himself had committed or participated in 1,218 violations of the Act, and the two companies he owned and oversaw committed an additional 178 violations.

**The Sanctions**

The Commissioner then explained the rationale for imposing the specific sanctions the Commissioner had decided to impose:

62.  For purposes of determining appropriate civil monetary sanctions, I have considered the 2 violations in which all three Respondents were participants in connection with assessing fines against each Respondent individually.

63.  If the maximum statutory penalty of $5,000 per violation were assessed, the violations described in paragraph 58 of this Final Order

17

would yield a monetary penalty of $6,090,000 for Respondent Rousseaux, $5,515,000 for Respondent EIA, and $1,015,000 for Respondent EWM, or a total of $12,620,000 for all Respondents, without giving effect to the multiplier created when the same set of facts forms a basis for more than one Count.

64. I adopt some and modify and add to the other penalties proposed by [the ALJ]. In doing so, I have acted pursuant to the discretion granted in assessing penalties under section 11-701.1(b) of the Act, and after careful consideration of the hearing record, the proposed rulings and proposed decision of [the ALJ], the exceptions and memoranda filed by the parties, the arguments presented in oral argument by the parties, and the additional information submitted to me at my request by counsel for Respondents regarding the Answer filed by Respondent Rousseaux. In particular, I have taken into consideration the steps that Respondents have taken to improve their compliance with the Act and its related rules, especially since the engagement of Oyster Consulting, LLC ("Oyster").

65. I adopt [the ALJ]'s analysis that sanctions may be imposed for past conduct. Specifically, section 11-701.1(b) of the Act provides in pertinent part:

Whenever the Commissioner determines . . . that a person *has engaged* in any act or practice constituting a violation of any provision of this title or any rule or order under this title, the Commissioner may in his discretion and in addition to taking any other action authorized under this title: . . .

(3) Bar such person from engaging in the securities business or investment advisory business in this State;

(4) Issue a penalty order against such person imposing a civil penalty up to the maximum amount of $5,000 for any single violation of this title; or

(5) Take any combination of the actions specified in this subsection. (Emphasis added [by Commissioner].)

66. Regarding the proposed monetary sanctions, although the violations in this case are both pervasive and significant, I conclude that it would be punitive to assess the maximum $5,000 penalty per violation. [The ALJ] proposed assessing a total monetary fine of

18

$265,000, of which $15,000 would be assessed against Respondent EWM and $250,000 would be assessed against Respondents EIA and Rousseaux, jointly and severally. I conclude that this total proposed monetary penalty, although based on a larger number of violations, is in the appropriate range. I also conclude, however, that the monetary penalties should be assessed in a way that is more proportionate to the violations attributable to each Respondent.

67. As to the non-monetary sanction, I adopt [the ALJ]'s proposed sanction suspending Respondent EIA's registration as an investment adviser for one year, rather than revoking that registration and/or permanently barring Respondent EIA from the securities and investment advisory businesses. [The ALJ] based this suspension "on the amount of time Oyster . . . required . . . to review and redraft the documents necessary to bring EIA into full compliance with the Securities Act and applicable regulations." Proposed Decision at p. 35. Although I conclude that Respondent EIA has not achieved full compliance with the Act and its related rules, I also conclude that this sanction properly balances the large number and serious nature of Respondent EIA's violations with its efforts to improve its compliance program.

68. I also adopt [the ALJ]'s proposed sanction to bar permanently Respondent EWM from engaging in the securities and investment advisory businesses in this State. Respondent EWM is not now and has never been registered as an investment adviser with the Division. Despite the concerns that the Division expressed as early as January 2012 about the lack of separation between Respondent EIA and Respondent EWM and that Respondent EWM appeared to be acting as an unregistered investment adviser (Proposed Ruling, Findings of Fact 79, 81), Respondent EWM persisted in acting as an investment adviser. For example, although not registered as an investment adviser with the Division, Respondent EWM required 67 of its clients to sign a Financial Planning Agreement, even though the activities connected with financial planning fall within the definition of investment adviser, *see* section 11-101(h)(1)(ii) of the Act, and the clients were required to sign the Financial Planning Agreement contrary to the advice of EWM's compliance consultant. Proposed Ruling, Finding of Fact 84. I conclude that respondent EWM's activities of this type, which are described in the Proposed Ruling,

19

Finding of Fact 84, fully support the imposition of the permanent bar.[4]

69. **Although I adopt [the ALJ]'s proposed revocation of Respondent Rousseaux's investment adviser representative registration, I conclude that it is also appropriate to impose the permanent bar on Respondent Rousseaux requested by the Division.**

70. **Respondent Rousseaux is the key person at both Respondent EIA and Respondent EWM and set the tone from the top at both of these entities. In addition to his individual violations, Respondent Rousseaux participated in a very significant portion of Respondent EIA's and Respondent EWM's violations, as well.**

---

[4] The ALJ's proposed Finding of Fact 84, which was adopted by the Commissioner in the Final Order in this case, provided:

84. Notwithstanding the Division's concerns and the representations of counsel, EWM has continued to act as [a]n investment advisor by, among other things:

- executing at least 67 Financial Planning Agreements (FPAs) with clients, contrary to the advice of EWM's compliance consultant, Rousseaux Tr., Ex. 31 at 5, Disney Aff., ¶75A and Ex. 15;

- using EWM letterhead in discussing securities related matters with advisory clients, Disney Aff., ¶75B and Ex. 32;

- holding out EWM's logo in comprehensive financial plans and on client intake forms and other documents asking about brokerage accounts, Rousseaux Tr., Exs. 1 and 7, Disney Aff. ¶75C and Ex. 33;

- offering financial planning services and security portfolio management on its Facebook page, Rousseaux Tr., Ex. 4; and

- holding out as an investment advisory or financial advisory firm on different social media websites, such as LinkedIn, Angie's List, Yelp, and the Better Business Bureau, Disney Aff., ¶75D and Ex. 34.

The record amply documents that Respondent Rousseaux has engaged in a pattern and practice over many years of both violating the Act and its related rules and demonstrating a striking lack of concern about compliance. The evidence begins with his purposeful, unauthorized use of blank ATA forms pre-stamped with the MetLife Stamp in over 90 separate instances and continues through the many violations that occurred over the time period covered by the Show Cause Order in connection with his operation of Respondents EIA and EWM. In some instances, Respondent Rousseaux and the entities he controlled took actions, despite information, cautions, and advice received from their own compliance consultants, that violated the Act and its related rules. See Proposed Ruling, Findings of Fact 63, 64, 66, 72, 73, 74, 84; Proposed Decision at p. 10, Finding of Fact 2, and at p. 13, Finding of Fact 2.

71. I have also considered that, as [the ALJ] noted in the Proposed Decision at page 34, "[r]espondents have consistently taken the position that they have not committed violations of law, or if they have, the violations were 'de minimis.'"[5]

72. In addition to characterizing violations, to the extent they are acknowledged at all, as minimal, some violations are simply described with words such as "oversight," "error," or "mistake." For example, the discussion of the wrap fee issue in Respondents' Opposition to Summary Decision Motion begins at page 12 with a definition of wrap fee program from a publicly available SEC website. Yet, the argument continues, EDGM was "mistakenly marketed . . . as a wrap program because [EIA] and Rousseaux did not understand that wrap was a specific term used to describe how the fees would be deducted from investor accounts." *Id*. at p. 14.

73. Respondent Rousseaux worked for many years in the financial industry as a registered representative and has been registered as an investment adviser representative since 2011, yet he contends that he did not know what a wrap fee program was. Respondent Rousseaux nevertheless caused to be filed with the

---

[5] The ALJ had noted in the May 5, 2016 Proposed Decision that the respondents believed they should be subject to "no sanctions or minimal sanctions together with retention of a compliance monitor."

**Division, and provided to EDGM investors, both a Disclosure Brochure and a Wrap Fee Program Brochure that contained unambiguous and accurate definitions of a wrap fee program. These definitions flatly contradicted how transaction fees in the EDGM Program were actually charged, which had also been clearly explained to him by a Charles Schwab representative in an email exchange when the program was being set up. Respondent Rousseaux knew or should have known how this critical aspect of the EDGM Program functioned. He was aware of how the Program was being marketed to EDGM investors and how it was being represented in regulatory filings. His knowing or reckless disregard of the discrepancy between the wrap fee disclosure language and the actual operation of the EDGM Program caused investors in the EDGM Program to be misled[,] and led to false and misleading filings with the Commissioner. His actions in this instance are emblematic of his ongoing disregard for both his compliance responsibilities and his obligation to provide full and accurate disclosure to his clients.**

74.    **I therefore conclude that the imposition of a permanent bar on Respondent Rousseaux, in addition to the revocation of his investment adviser representative registration, is warranted.**[6]

(Emphasis added.)

**Judicial Review**

Mr. Rousseaux, EIA, and EWM all joined in filing a petition for judicial review in the Circuit Court for Baltimore City. The sole question raised by them in the circuit court was similar to the question presented in this Court, challenging only the sanction imposed by the Commissioner. The circuit court concluded that "the Commissioner's sanction was 'lawful and authorized,' based on findings of fact and law in a 'reasonable and rational' Final Order, and was not so 'extreme and egregious to be considered arbitrary and

---

[6]    The Commission is authorized by CA § 11-412 to revoke a registrant's registration.

capricious.' [Citing *Harvey v. Marshall*, 389 Md. 243, 300 (2005).]" The court affirmed the final order of the Commissioner.

This appeal by Mr. Rousseaux followed. Neither EIA nor EWM filed a notice of appeal.

## STANDARD OF REVIEW

Mr. Rousseaux contends the sanctions imposed by the Commissioner were arbitrary and capricious. In *Harvey v. Marshall*, 389 Md. 243, 295-304 (2015), Judge Glenn T. Harrell, Jr., surveyed Maryland cases that have applied the "arbitrary or capricious" standard to review discretionary rulings of administrative agencies. In *Harvey*, Judge Harrell observed that arbitrary or capricious decision-making "occurs when decisions are made impulsively, at random, or according to individual preference rather than motivated by a relevant or applicable set of norms." *Id*. at 299. He further noted that "[m]ost cases . . . recognize as a threshold matter the extremely deferential nature of the 'arbitrary or capricious' standard." *Id*.

More recently, the Court of Appeals has reiterated:

> With respect to matters committed to agency discretion, a reviewing court applies the "arbitrary and capricious" standard of review, which is "extremely deferential" to the agency. *Harvey v. Marshall*, 389 Md. 243, 296-99 (2005); *Spencer v. Md. State Bd. of Pharmacy*, 380 Md. 515, 529 (2004). **This standard is highly contextual, but generally the question is whether the agency exercised its discretion "unreasonably or without a rational basis."** *Harvey*, 389 Md. at 297; Arnold Rochvarg, Maryland Administrative Law, § 20.1 at 255 (2011).

*Maryland Dept. of the Environment v. County Comm'rs of Carroll County*, 465 Md. 169, 202 (2019) (emphasis added). The Court added:

23

For guidance, a reviewing court may look to case law applying the similar standard in federal administrative law. *See Anacostia Riverkeeper*, 447 Md. at 120-21; *Office of People's Counsel v. Public Service Commission*, 461 Md. 380, 399 (2018). Under this standard, **a reviewing court is not to substitute its own judgment for that of the agency and should affirm decisions of "less than ideal clarity" so long as the court can reasonably discern the agency's reasoning**. *Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285-86 (1974).

*Id*. (emphasis added; footnote omitted). *Cf.* ARNOLD ROCHVARG, PRINCIPLES AND PRACTICE OF MARYLAND ADMINISTRATIVE LAW, §§ 23.8-23.9 (2011) (citing *Maryland State Board of Social Work Examiners v. Chertkov*, 121 Md. App. 574 (1998), as setting forth "the proper analysis for judicial review of an administrative sanction," § 23.9 at 288).

## DISCUSSION

Mr. Rousseaux avers that the "sanctions imposed against [him] are arbitrary and capricious because their unprecedented severity denied Mr. Rousseaux notice of the degree of sanctions that could be imposed, resulting in the denial of due process." He quotes a comment from *Harvey*, *supra*, 389 Md. at 303, where the Court of Appeals observed that "any agency action may be 'arbitrary and capricious' if it is irrationally inconsistent with previous agency decisions." He also cites *Christopher v. Montgomery Cty. Dep't of Health & Human Servs.*, 389 Md. 188, 215 (2004), and *Montgomery Cty. v. Anastasi*, 77 Md. App. 126, 137 (1988) ("In rendering opposite decisions based on indistinguishable facts, without adequately explaining the basis for doing so, the Board has exercised this authority in an arbitrary manner in violation of Maryland State Government Article § 10–215(g)(3)(vi).").

Mr. Rousseaux contends that he had inadequate notice of the potential sanctions for his violations of the Act because, he claims, the sanctions the Commissioner imposed against him were not consistent with prior decisions of the Division. He asserts: "Publicly available, full adjudications of contested cases by the Securities Division do not reveal that the Securities Division has ever permanently barred an individual from the Maryland securities and investment advisory industry where, as the [Commissioner] found here, an individual had compliance failings but did not misappropriate client funds, cause material financial injury to clients, act as an unregistered representative, or sell unregistered securities."  He adds: "Moreover, the Securities Commissioner has imposed revocations and bars from the securities and investment advisory industry *only* where respondents' misdeeds included a failure to register themselves or their securities."  Consequently, he asserts, he "had no notice that his misconduct could lead to a permanent revocation and bar and a $255,000 fine."

The Commissioner responds that Mr. Rousseaux did not cast his lack-of-notice argument in due process terms during the hearings at the agency level. But, aside from the preservation deficiency, the Commissioner asserts that Mr. Rousseaux's argument that he had no notice that his 1,218 violations of the Act could result in a permanent bar is specious. The Act plainly authorizes the Commissioner to impose that sanction for any violation of the Act, and the Division's show cause order directed the respondents— including Mr. Rousseaux—to show cause why they should not be permanently barred from engaging in the securities and investment advisory business in Maryland.  We agree with the Commissioner that the lack of notice argument is without merit.

25

With respect to Mr. Rousseaux's argument that the sanctions imposed upon him by the Commissioner were unreasonably harsh when compared to prior cases, the Commissioner responds that Mr. Rousseaux has not identified any prior case in which a respondent's violations were the same as Rousseaux's, but, even if there were such a case, the Commissioner would not be obligated to imposed an identical sanction if there was ample justification, explained by the Commissioner, to impose the sanction that Mr. Rousseaux received. And, here, the Commissioner asserts, the final order "provided detailed reasoning explaining the basis for the sanctions imposed against Mr. Rousseaux in light of the number and nature of the violations he had committed." The Commissioner argues that the prior Division cases cited by Mr. Rousseaux do not prove that the sanctions imposed in his case were arbitrary and capricious because (a) they are factually distinguishable, and (b) they demonstrate that the sanction barring a registrant from engaging in business in Maryland for violations of the Act has been imposed many times since it was authorized by the General Assembly in 1989.

The Commissioner points out that Mr. Rousseaux—and the companies he controlled—committed "an unprecedented number of violations of the Securities Act." Also, his violations occurred over a long period of time, which was a point emphasized by the Commissioner in the final order: "Respondent Rousseaux has engaged in a pattern and practice over many years of both violating the Act and its related rules and demonstrating a striking lack of concern about compliance."

Further, the Commissioner notes in the brief filed in this Court:

26

[M]any of Mr. Rousseaux's violations were intentional and committed in contravention of advice [he] received from compliance consultants or from warnings issued by the Division. Very few of the [prior Division] decisions identified in [Mr. Rousseaux's] brief contain findings of intent or recklessness. Mr. Rousseaux, however, was found to have engaged in fraudulent, dishonest, and unethical behavior.

In our view, no rational person who is registered to act as an investment advisor in Maryland could review the results of the contested cases cited by Mr. Rousseaux and, based upon that review, reasonably conclude that there was no likelihood of being barred from providing investment advisory services if that person committed the violations of the Act that the Commissioner found Mr. Rousseaux had committed.

Indeed, we fail to see how a rational person in the investment advisory business in Maryland could claim a lack of notice that the Commissioner has been empowered since 1989 to impose a bar, plus a fine, for *any* violation of the Act. The statute is absolutely clear on this point. Here, the Commissioner found—and Rousseaux has not challenged the Commissioner's finding that—Rousseaux violated CA §§ 11-301(2), 11-301(3), 11-302(a), 11-302(a)(2), 11-302(a)(3), 11-302(c), 11-303, 11-401(b), 11-402(b), 11-411, 11-411(a), 11-411(d), 11-412(a)(2), and 11-412(a)(7), as well as COMAR 02.02.05.11, 02.02.05.12, and 02.02.05.16. And many of the violations were repeated multiple times. We perceive no lack of notice to Mr. Rousseaux that he was subject to being barred as a sanction for his violation.

In addition to claiming he had no notice of the potential sanctions for his violations of the Act, Mr. Rousseaux argues, in the alternative: "Sanctions that are extremely or egregiously disproportionate to the underlying misconduct render a decision

27

arbitrary and capricious. [Citing] *Md. Aviation Admin. v. Noland*, 386 Md. 556, 581 (2005)." He further asserts that the factors enumerated in a federal case—*Steadman v. S.E.C.*, 603 F.2d 1126, 1140 (5th Cir. 1979)—"provide useful guidance for assessing whether Mr. Rousseaux's sanctions were arbitrary or capricious in light of the misconduct at issue." In his brief, he states:

> In a decision followed by other federal courts of appeals, the Court of Appeals for the Fifth Circuit set forth factors relevant to an agency's imposition of sanctions for securities law violations:
>
> > [i.] the egregiousness of the defendant's actions, [ii.] the isolated or recurrent nature of the infraction, [iii.] the degree of scienter involved, [iv.] the sincerity of the defendant's assurances against further violation, [v.] the defendant's recognition of the wrongful nature of his conduct, and [vi.] the likelihood that the defendant's occupation will present opportunities for future violations.
>
> *Steadman v. S.E.C.*, 603 F.2d 1126, 1140 (5th Cir. 1979). The factors provide useful guidance for assessing whether Mr. Rousseaux's sanctions were arbitrary or capricious in light of the misconduct at issue.

(Footnote omitted.)

As a preliminary matter, we point out that the *Steadman* case was not binding upon the Commissioner (or us), and is arguably in conflict with Maryland cases that prohibit courts from imposing the courts' own standards upon Maryland's administrative agencies. *See Noland, supra*, 386 Md. at 574-79. But, in any event, we reject Mr. Rousseaux's contention that application of the *Steadman* factors supports his assertion that "a permanent revocation and bar and a $255,000 fine is egregiously disproportionate and unnecessarily severe in light of Mr. Rousseaux's misconduct."

28

As the Court of Appeals observed in *Maryland Dep't of the Environment, supra*, 465 Md. at 202, "generally the question is whether the agency exercised its discretion unreasonably or without a rational basis." (Internal quotation marks and citations omitted.) Here, the Commissioner provided a clear and rational explanation for the conclusion that the numerous violations committed by Mr. Rousseaux warranted a substantial fine, plus revocation of his registration as an investment adviser representative and imposition of a permanent bar from engaging in the securities and investment advisory business in Maryland. As noted above, the Commissioner's final order explained:

> 70. . . . The record amply documents that Respondent Rousseaux has engaged in a pattern and practice over many years of both violating the Act and its related rules and demonstrating a striking lack of concern about compliance. The evidence begins with his purposeful, unauthorized use of blank ATA forms pre-stamped with the MetLife Stamp in over 90 separate instances and continues through the many violations that occurred over the time period covered by the Show Cause Order in connection with his operation of Respondents EIA and EWM. In some instances, Respondent Rousseaux and the entities he controlled took actions, despite information, cautions, and advice received from their own compliance consultants, that violated the Act and its related rules. . . .

> 71. I have also considered that, as [the ALJ] noted in the Proposed Decision at page 34, "[r]espondents have consistently taken the position that they have no committed violations of law, or if they have, the violations were 'de minimis.'"

> 72. In addition to characterizing violations, to the extent they are acknowledged at all, as minimal, some violations are simply described [by respondents] with words such as "oversight," "error," or "mistake." [For example, respondents argued in their opposition to the Division's motion for summary decision that the EDGM wrap fee program] was "mistakenly marketed . . . as a wrap program because [EIA] and Rousseaux did not understand that wrap was a specific term used to describe how the fees would be deducted from investor accounts." . . .

29

73. . . . [Mr. Rousseaux's] actions [regarding the wrap fee program] are emblematic of his ongoing disregard for both his compliance responsibilities and his obligation to provide full and accurate disclosure to his clients.

The Commissioner's explanation of the $255,000 financial sanction was also quite reasonable. Although the maximum fine of $5,000 for each of the 1,218 violations would have totaled $6,090,000, the financial sanction imposed by the Commissioner was 4.2% of that amount, and represented an average fine of $209.36 for each violation of the Act. The Commissioner's opinion persuades us that the factors relative to fines set forth in COMAR 02.02.01.04 were considered.

Despite the Commissioner's findings and explanation for the sanctions imposed, Mr. Rousseaux asserts in his brief: "Here, every [*Steadman*] factor demonstrates that a permanent revocation and bar and a $255,000 fine is egregiously disproportionate and unnecessarily severe in light of Mr. Rousseaux's misconduct." In our view, however, there was evidence relative to each of the *Steadman* factors that supported the sanctions imposed. The Commissioner found that Mr. Rousseaux's conduct was egregious; the violations of the Act were numerous and continued over many years; there was scienter that use of the pre-stamped MetLife forms was unauthorized, intentional, and deceitful; there was a knowing or reckless misrepresentation of the wrap fee program; Mr. Rousseaux had consistently "taken the position that [he had] committed no violations of law"; he had displayed an "ongoing disregard for both his compliance responsibilities and his obligations to provide full and accurate disclosure to his clients"; he had committed violations despite being advised by his own compliance consultants of problems with the

30

conduct; and, in the absence of a bar, permitting him to retain his registration as an investment advisor would provide fertile opportunities for him to commit future violations. To the extent that the *Steadman* factors "provide useful guidance for assessing whether Mr. Rousseaux's sanctions were arbitrary or capricious," the factors overwhelmingly support our conclusion that the sanctions were neither arbitrary nor capricious.

Although the Commissioner points out that Mr. Rousseaux engaged in a fraudulent course of dealing by using the pre-stamped forms bearing the MetLife Medallion Signature Guarantees after he was no longer employed by MetLife, and not just once or twice, but intentionally, 91 times, Mr. Rousseaux minimizes these flagrant acts of dishonesty by asserting that they occurred years ago. In his exceptions to the ALJ's proposed findings regarding the fraudulent use of the pre-stamped forms, he stated: "Mr. Rousseaux does not contest that he took forms from MetLife and used them through 2007. However, it is undisputed that Mr. Rousseaux has not used these forms for the past nine years, that each client who requested the transfer had properly signed the transfer form and wanted his or her assets transferred, and that certain of these clients remain clients of the Respondents." He suggests that the Commissioner should not be able to consider these acts of dishonesty in deciding whether he should be permitted to continue to provide investment advisory services in Maryland because, he proposes, there should be a statute of limitations on sanctions for dishonest conduct. (Mr. Rousseaux suggests five or ten years would be an appropriate time limit.)

31

The Act contains no such statute of limitations, and it would make little sense to charge the Commissioner with protecting the public against dishonest registrants but then prohibit the Commissioner from considering flagrant acts of deception that occurred more than a certain number of years in the past. The Commissioner did not find the argument about a statute of limitations persuasive, and we discern no abuse of discretion in the Commissioner's rejection of that argument.

As his final reason for arguing that the permanent bar should be overturned, Mr. Rousseaux contends that the bar "is arbitrary and capricious because the [Commissioner] decreased the number of violations yet increased the sanctions' severity." This argument seems to suggest that the Commissioner should have been bound by the ALJ's recommendation of the appropriate sanction for violations. That turns on its head the fact that the Commissioner is the final decision maker, and the ALJ is merely making a recommendation with respect to the appropriate sanction. Until the Commissioner issued the final decision in this case, there was no agency ruling with respect to the sanctions. Mr. Rousseaux's assertion that the Commissioner's choice of sanctions was somehow prohibited by our ruling in *Md. Real Estate Comm'n v. Garceau*, 234 Md. App. 324, 365-66 (2017), disregards the substantially different procedural posture of that case and the penalty we found troubling there. In *Garceau*, upon remand of a case after the circuit court had reversed part of the agency's ruling, the agency had not only declined to modify the sanctions it had previously imposed, but also had provided no explanation for rendering the same sanction. Here, the Commissioner was the final decision maker, and,

in compliance with COMAR 02.02.06.24B, the Commissioner's final order provided a rational explanation for the choice of sanctions.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**